UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF MISSISSIPPI

IN RE: GREGORY SCOTT DALTON                     CASE NO. 11-11106-DWH
                                                CHAPTER 11

CELLULAR SOUTH, INC.                            PLAINTIFF/COUNTER-DEFENDANT

VERSUS                                          ADV. PROC. NO. 11-01048-DWH

GREGORY S. DALTON, INDIVIDUALLY,
and d/b/a LOUISVILLE ELECTRONICS                DEFENDANT/COUNTER-PLAINTIFF

OPINION

On consideration before the court is a complaint for declaratory judgment filed on behalf of the plaintiff/counter-defendant, Cellular South, Inc., ("Cellular South"); an answer, affirmative defenses, and a counter-claim having been filed by the debtor/defendant/counter-plaintiff, Gregory Scott Dalton, individually, and d/b/a Louisville Electronics, (collectively, "Dalton"); a responsive pleading to the counter-claim having been filed by Cellular South; on proof in open court; and the court, having heard and considered same, hereby finds as follows, to-wit:

I.

The court has jurisdiction of the parties to and the subject matter of this adversary proceeding pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157. This is a non-core proceeding as described in *Stern v. Marshall,* 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011). Both Cellular South and Dalton, through their respective counsel, expressly consented in writing that this court could hear and determine this proceeding and enter final orders and judgments subject to appeal

pursuant to 28 U.S.C. § 158, all as contemplated by 28 U.S.C. § 157(c)(2). *See Technical Automation Services Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 404-07 (5th Cir. 2012).

## II.

Cellular South is a provider of wireless telecommunications services and equipment to its subscribers. It has performed retail sales functions through both company owned retail stores and by entering into agency agreements with independent contractors. When Cellular South used independent contractors as agents, it allowed such contractors to sell its equipment and services on a commission basis. Cellular South paid a one-time commission to the agent for each new customer signed by the agent. The agent would not receive additional compensation if the customer extended or renewed an existing contract, nor would the agent be compensated if the existing customer purchased new or upgraded equipment.

In 1992, Dalton entered into a non-exclusive agency agreement ("Agreement") with Cellular Holding, a predecessor to Cellular South, which was replaced by a similar Agreement on March 1, 1993. Dalton's agency was one of ninety (90) agencies established by Cellular South. However, there were only approximately eight (8) agencies, including Dalton's, that had an Agreement with the same language as Dalton's Agreement, specifically the second sentence in Section 3.1 which is addressed below. Sections 3.1, 3.3, 3.4, and 3.5 of the Agreement are the provisions relevant to this litigation and read, in pertinent part, as follows:

> 3.1 Term: The term of the Agreement shall be one year, commencing on the date specified in Exhibit D of this Agreement, unless otherwise terminated or renewed pursuant to the provisions hereinafter provided. Cellular [][South] is cognizant of the increasing value of the Agency relationship to a successful AGENT and therefore will terminate a successful Agency relationship only if Cellular [][South] determines that the continuation of the Agency relationship would be

detrimental to the overall well being, reputation and goodwill of Cellular
[][South].

3.3 Renewal: This Agreement shall be automatically renewed for one-year terms
unless terminated as herein provided.

3.4 Default: In the event AGENT fails to perform any of its obligations under this
Agreement and such failure continues unremedied for a period of thirty (30) days
after written notice is given by Cellular Holding to AGENT, then Cellular
Holding may thereupon elect to cancel and terminate this agreement, which
termination shall be effective immediately upon the expiration of said thirty-day
period.

3.5 Termination: Either party may terminate this Agreement by giving the other
party written notice of its desire to terminate at least thirty (30) days prior to the
intended date of termination. . . .
Further, Cellular Holding shall have the right to terminate this Agreement
effective upon written notice if:
A)      AGENT makes an assignment for the benefit [sic] of the creditor;
B)      An order for relief under Title 11 of the United States Code is entered by
any United States Court against AGENT;
C)      A trustee or receiver of any substantial part of the AGENT's assets is
appointed by any Court; or
D)      AGENT (1) has made any material misrepresentation or omission in its
application to establish any agency relationship with Cellular Holding or AGENT
(or any principal thereof) is convicted of or pleads no contest to a felony or other
crime or offense that is likely in Cellular Holding's sole opinion to adversely
affect the reputation of Cellular Holding or its affiliated companies or the
goodwill associated with the Marks; (2) attempts to make an unauthorized
assignment of this Agreement; (3) receives a notice of violation of the terms or
conditions of any license or permit required by AGENT or its employees in the
conduct of AGENT's Cellular Telephone Service business and fails to correct
such violation; (4) fails to comply with any provision of this Agreement, or any
tariff relating to Cellular Telephone Service and does not correct such failure
within thirty (30) days after written notice of such failure to comply is delivered to
AGENT; or (5) fails to comply with any material provisions of this Agreement, or
any tariff relating to Cellular Telephone Service, whether or not such failures to
comply are corrected after notice thereof is delivered to Agent.

From 1992-2003, Dalton sold Cellular South equipment and services through his Radio Shack store located in Louisville, Mississippi. Cellular South paid commissions to him as required by the Agreement.

In 2003, Cellular South decided to discontinue its use of all of the independent agents. On December 19, 2003, Cellular South, through its Director of Sales, Terrell Knight, sent Dalton a letter notifying him of its decision to terminate his Agreement, which was to be effective February 6, 2004. The letter, (Defendant's Exhibit 7), stated the reason for termination as follows:

> This letter serves as notice to you under the Authorized Agent Agreement executed by you and Cellular South <u>pursuant to a reorganization of Cellular South's retail distribution plan</u>, Cellular South is terminating its Agent Agreement with you effective February 6, 2004. (emphasis supplied)

Dalton disputed Cellular South's right to terminate the Agreement, asserting that the requirement for termination set forth in Section 3.1 of the Agreement had not been satisfied.

Cellular South initially filed this cause of action in the Circuit Court of Winston County, Mississippi, in 2005, seeking a declaratory judgment that it acted within its contractual rights in terminating the Agreement, and that it owed no further duties to Dalton. Dalton filed a counterclaim seeking damages for Cellular South's alleged wrongful termination of the Agreement. The parties engaged in discovery and filed cross motions for summary judgment.

The Circuit Court granted summary judgment for Cellular South, finding that the Agreement was unambiguous, and that Cellular South had terminated the Agreement in compliance with its terms. Dalton appealed, and the Mississippi Court of Appeals affirmed the Circuit Court's decision. On further appeal, the Mississippi Supreme Court reversed both

4

decisions, finding that the clauses in the Agreement were ambiguous when read together. It remanded the case to the Winston County Circuit Court for a jury determination as to whether Cellular South had properly terminated the Agreement. *See Dalton v. Cellular South, Inc.*, 20 So. 3d 1227, 1233 (Miss. 2009).

Following remand, the parties completed discovery and a trial date was set for May 2011. Dalton filed the above captioned bankruptcy case on March 9, 2011, pursuant to Chapter 11 of the Bankruptcy Code, and removed the cause of action to this court.

In its opinion, the Mississippi Supreme Court provided the following explanatory language which this court has considered in formulating its decision, to-wit:

> We find the contract clauses, standing alone, are unambiguous. Giving the words their plain and ordinary meaning does not generate an ambiguity. *See Miss. Farm Bureau Cas. Ins. Co. v. Britt*, 826 So. 2d 1261, 1266 (Miss. 2002). However, when the clauses are read together, the clauses conflict. A conflict within the whole meets the very definition of ambiguity. "An ambiguity is defined as a susceptibility to two reasonable interpretations." *Amer. Guarantee & Liability Ins. Co. v. 1906 Co.*, 129 F.3d 802, 811-12 (5th Cir. 1997) (citing *Ins. Co. of N. Amer. v. Deposit Guar. Nat'l Bank*, 258 So. 2d 798, 800 (Miss. 1972)). A widely-quoted judicial definition of "ambiguous" is as follows:
>
>> An "ambiguous" word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.
>
> . . . .
>
> The contract at issue contains termination clauses that lack clarity and that are not harmonious. Clause 3.1 calls for a one-year term and restricts the right of CSI to terminate the agreement as to "a successful AGENT" and "a successful Agency relationship." Clause 3.3 allows for automatic one-year renewals. Clause 3.5 allows either party to terminate at will. Clause 3.4 and the unnumbered paragraph following clause 3.5 allow CSI to terminate with cause under certain circumstances. Thus, reasonable minds could reach different conclusions after

reading the whole contract, in discerning the intent of the parties, while giving effect to each separate clause. We find that the conflicts among the clauses create an ambiguity. *Perkins* [558 So. 2d 349 (Miss. 1990)] establishes the next tier of canons of construction, i.e., resolution of ambiguities shall disfavor the drafter of the instrument. *Id.* However, resolving the ambiguity to give Dalton the most favorable interpretation does not end the inquiry.

The language of the contract requires the use of parol or extrinsic evidence to determine if Dalton is eligible for 3.1 consideration, as 3.1 applies only to "a successful AGENT" with "a successful Agency relationship," which cannot be determined within the four corners of the contract. A court cannot complete the third tier of analysis without parol or extrinsic evidence. In the case sub judice, this evidence was provided by CSI, whose president attested, "Dalton's agency was a successful agency...." However, that finding begs the question as to whether CSI terminated the contract for the reason it originally furnished to Dalton or whether CSI terminated the contract for the reasons offered after litigation began. That determination is a material fact and is in dispute. Whether CSI honored or breached the contract is a task for a jury, which leads us to Issue II. *See Royer Homes*, 857 So. 2d at 752 ("If the terms of a contract are subject to more than one reasonable interpretation, it is a question properly submitted to the jury."); *Burton v. Choctaw County*, 730 So. 2d 1, 9 (Miss. 1997).

*Dalton*, 20 So. 3d at 1232-33.

### III.

In its post-trial memorandum, Cellular South offered four scenarios that were applicable to the termination provisions set forth in the Agreement, to-wit:

1) Pursuant to Section 3.5, Dalton may terminate the Agreement for any reason as long as he gives thirty (30) days' written notice of his intent to terminate.

2) Cellular South may terminate the Agreement by giving thirty (30) days' written notice pursuant to the first sentence in Section 3.5, but its reasons for termination are limited by the second sentence in 3.1. It may terminate the Agreement only if it determines that a continuation of the agency relationship will be detrimental to the overall well being, reputation, and goodwill of Cellular South.

3) Cellular South may also terminate the Agreement pursuant to Section 3.4 in the event of a default by Dalton. However, it must provide Dalton with

> written notice of the default and allow him thirty (30) days to cure the default before the contract may be terminated.
>
> 4) The second sentence in Section 3.5 lists reasons why Cellular South may terminate the Agreement without giving thirty (30) days' written notice. These reasons only require written notice and do not specify a length of time for the notice.

The court concurs with Cellular South that the aforementioned four scenarios appropriately reflect the ways by which the Agreement may be terminated. Cellular South candidly recognizes the efficacy of the second sentence in Section 3.1, which provides that Cellular South will terminate a successful agency relationship only if Cellular South determines that the continuation of the agency relationship would be detrimental to the overall well being, reputation and goodwill of Cellular South. As such, this sentence must be considered by the court in determining whether Cellular South breached the Agreement insofar as Dalton is concerned. *See Brown v. Hartford Ins. Co.*, 606 So. 2d 122, 126 (Miss. 1992) ("When construing a contract, we read the contract as a whole, so as to give effect to all of its clauses"); *see also, Nicholas Acoustics and Specialty Co. v. H & M Const. Co.*, 695 F.2d 839, 843 (5th Cir. 1983)("[c]ontracts should be construed so as to avoid unfair or unreasonable results").

To determine whether Cellular South terminated Dalton's Agreement in keeping with its terms, the court must examine the reasoning underpinning Cellular South's decision to terminate. Victor Hugo "Hu" Meena, the President and Chief Executive Officer of Cellular South, testified at trial that he made the decision to discontinue Cellular South's agency program. Earlier, Meena had submitted an affidavit, (Defendant's Exhibit 8), which was consistent with his in court testimony. Excerpts from this affidavit are set forth as follows:

7

> Cellular South has never granted "franchises" in its business. Mr. Dalton's agency was never intended as a "franchise." Cellular South never charged nor accepted any franchise fee from Mr. Dalton for his agency.
>
> Mr. Dalton's was one of approximately ninety (90) agency relationships terminated by Cellular South at my direction in late 2003 and early 2004. Cellular South's decision to discontinue the use of independent agents was in large part due to the administrative burdens that it had experienced in managing independent agents throughout its service area. These administrative burdens included assigning a dedicated management employee to oversee the agents, keeping up with commissions earned by the agents, which did not vest until the customer had remained with Cellular South for a pre-determined period of time, and insuring that agents were marketing Cellular South's service in a manner consistent with Cellular South's corporate marketing strategy.
>
> At or about the same time that I made the decision to terminate the independent agents used by Cellular South, Cellular South's own network of company-owned retail stores had become sufficient to perform its necessary retail functions.
>
> Cellular South's reputation for good customer service and the uniformity of the customers' experiences in dealing with Cellular South, regardless of whether they contact Cellular South by visiting its stores, calling on the telephone or using the Cellular South website, are critical to Cellular South's ability to maintain and grow its customer base. At the time I made the decision to terminate the use of agents, I believed and still do believe that Cellular South is better able to maintain its overall customer service standards without the use of independent agents.
>
> To the best of Cellular South's and my knowledge, Dalton's agency was a 'successful' agency in terms of sales. However, it was impractical for Cellular South to maintain some agents while terminating others, since the administrative burden of maintaining a few agents would have been very similar to the burden of maintaining them all. For these reasons, I determined that continuation of Cellular South's agency relationships, including Dalton's, would be detrimental to the overall well being, reputation and goodwill of Cellular South.

Succinctly stated, Meena indicated that the decision to terminate Dalton's agency relationship was not personal to Dalton. Meena candidly acknowledged that Dalton's agency was a successful agency in terms of sales. However, the decision to discontinue the use of all of the agents was in large part due to the administrative burdens that Cellular South had

8

experienced in managing the agents. These administrative burdens were described both in Meena's affidavit and in his trial testimony. Meena indicated that Cellular South was better able to maintain its overall customer service standards without the use of independent agents. His reasoning was not contrived for purposes of his affidavit or his later testimony because it is completely consistent with the language set forth in the termination letter sent to Dalton on December 19, 2003.

As noted earlier in this opinion, the agents were paid a one-time commission to solicit customers to utilize the Cellular South system. The commissions vested after the customer continued to use the service for periods of either 90 or 180 days. The agents were paid no additional compensation when or if the customer renewed the service or when the customer acquired new or upgraded equipment. As the system was structured, the agents had minimal involvement in continuing customer service or customer relations.

Meena testified that the agency program had other problems that were detrimental to Cellular South's operational efficiency. One problem, in particular, was the excessive "churn" in the sales made through agents as compared to sales through the company owned stores or through online outlets. This meant that more customers signed by agents terminated their relationships with Cellular South than those customers who were obtained through other marketing efforts. Meena thought the company owned stores provided a more stable base to promote customer service and continuing customer relations.

Other problems included bookkeeping issues, the lack of uniformity in branding and marketing efforts at agency outlets, delays in collections from agency sales (this even occurred at Dalton's agency), and agents' complaints resulting from Cellular South's telephone pricing

9

policy. (The last issue arose because the agents were required to sell telephones at Cellular South's retail price which was actually below the cost price that Cellular South paid for the telephones. This sales incentive was consistent with Cellular South's desire to obtain and maintain long standing customer relationships, but, it sparked the agents' complaints because it eroded their commission margins.)

Insofar as Dalton was concerned, Meena indicated that it was impractical for Cellular South to maintain some agents while terminating others since the administrative burden of maintaining a few agents would have been very similar to the burden of maintaining them all. Because of these factors, Meena stated that he concluded that the continuation of the agency relationships, including Dalton's, would be detrimental to the overall well being, reputation, and goodwill of Cellular South. Significantly, Meena's reasoning underpinning the discontinuance of the agency program has not been discredited or contradicted.

Meena's decision redirected the focus of Cellular South's sales program to its company owned retail stores where customers could receive the full panoply of services. At trial, Meena indicated that Cellular South now has 65 stores in operation and over 400 employees working at these stores. Consequently, the court perceives the decision to discontinue all of the agency relationships to be within the province of Cellular South's business judgment.

In support of his position, Dalton focused entirely on the second sentence in Section 3.1. While he acknowledged at trial that he could terminate the Agreement for any reason or no reason at all, he asserted that Cellular South could terminate his agency relationship, since he was successful in sales, only for cause. Dalton maintains that he is entitled to lost profits as damages

from the date of the termination of the Agreement through the remainder of his work life expectancy. He also seeks extra contractual damages for mental anguish, as well as, punitive damages.

IV.

The Mississippi Supreme Court concluded that the Cellular South/Dalton Agreement was ambiguous because the aforementioned sections, which address termination, conflict when read together. *Dalton*, 20 So. 3d at 1233. The Court, citing *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 352 (Miss. 1990), then stated that once a contract is found to be ambiguous, the resolution of any uncertainties should be construed against the drafter of the contract, which in this proceeding was Cellular South. The Supreme Court added, however, that resolving the ambiguity to give Dalton the most favorable interpretation did not end the inquiry. *Id.* It directed the state trial court to apply the third tier of the Canons of Contract Construction which contemplates the use of parol or extrinsic evidence to complete the analysis. *Id.* This court has now completed the third tier analysis through the trial process in order to determine the intent and purpose of the Agreement.

Dalton's interpretation of the second sentence in Section 3.1 of the Agreement is extremely narrow. His interpretation literally ignores the intent of the first sentence of Section 3.1, as well as, Section 3.5. It specifically leaves no room for Cellular South to make a reasoned business judgment decision that the continuation of all the agency relationships would be detrimental to the overall well-being, reputation and goodwill of Cellular South. Indeed, Cellular South considered the administrative burdens and inefficiencies that were adversely impacting customer service and customer relationships resulting from the agency program and made a

11

determination to discontinue the program. To conclude that Dalton's agency could not be terminated because he had an outstanding sales record, when all of the other agencies were being terminated for legitimate reasons, leads to a tortured result which is not consistent with the overall purpose of the Agreement.

In the opinion of the court, even though Dalton had a successful agency, Cellular South still had the right to terminate his agency because the termination complied with the second sentence in Section 3.1 of the Agreement. As noted above, the reason for the termination is consistent with the notice that was sent to Dalton on December 19, 2003. (Defendant's Exhibit 7)

Following the consideration of the parol and extrinsic evidence presented at trial, the court concludes that Cellular South did not breach the Agreement. Although the court has construed this Agreement in a light more favorable to Dalton, it cannot and should not make a determination that permits the Agreement to have an illogical or absurd effect. The fact that Dalton's agency was considered successful in the area of sales did not preclude Cellular South from discontinuing an entire program that was undisputedly not successful. While the language within the "four corners" of the Agreement was ambiguous when the termination provisions were read together, the extrinsic evidence convinces the court that the Agreement could be terminated if the agency program did not prove to be in the best economic interest of Cellular South. Otherwise, Dalton would have had a far better arrangement than any other employee or agent in the Cellular South organization, including Meena.

In keeping with the above analysis, the court is of the opinion that the complaint for declaratory relief filed by Cellular South is well taken. The counter-claim filed by Dalton against

Cellular South is not well taken and will be dismissed with prejudice. A separate order will be entered consistent with this opinion.

V.

Even if the court had reached a different result and had decided this case in Dalton's favor, the issue of awarding damages to Dalton would be extremely problematic. The court certainly realizes that no further comment is necessary to finalize this opinion. However, because a lengthy period of time was devoted to the question of Dalton's damages at trial, the court feels obligated to express its conclusions relative to this question in the event that these conclusions subsequently become material.

Damages recoverable for a breach of contract must arise naturally and normally from the breach, and they must be those which the parties could have contemplated when the contract was made as the probable result of a breach. Lost profits in a breach of contract action must be established with reasonable certainty and not merely be based on speculation or conjecture. *Lovett v. Garner*, 511 So. 2d 1346, 1352 (Miss. 1987). In the proceeding before the court, the testimony focusing on Dalton's economic damages varied widely primarily because Dalton was operating three separate businesses under the umbrella of Louisville Electronics. The three businesses were Dalton's Cellular South agency, his Radio Shack store, and his computer sales and repair business.

The three entities reported taxable income to the Internal Revenue Service averaging approximately $22,000.00 per year. The records for the businesses were not segregated so there was no ideal way to isolate the revenue and overhead that should be attributable to each.

Dr. Laurie Burney, a cost accounting expert witness offered by Dalton, utilized a transactional approach based on sales activities to allocate overhead and thereby calculated a net profit amount for Dalton's Cellular South agency. Her methodology resulted in an average annual profit, based on a three year analysis, of $93,465.00 per year.

Dr. Charles Dennis, an economist expert offered by Dalton, utilized Burney's average annual profit number, projected that number over Dalton's normal work life expectancy, and calculated Dalton's total potential profits from the Cellular South agency as $1,715,188.00.

Certified Public Accountant Keith Winfield, an accounting expert offered by Cellular South, utilized a revenue approach to derive the annual average profit for Dalton's Cellular South agency, and calculated the number to be $5,000.00 per year. In contrast to Dr. Burney, he testified that it was impossible for the Cellular South agency to generate an average profit of $93,465.00 per year when all three entities were reporting taxable income of only $22,000.00 annually. He explained that if the $93,465.00 number were accurate, then the Radio Shack store and the computer repair business would have been sustaining devastating losses that would have merited their closing.

Dr. Gerald Lee, an economist expert offered by Cellular South, applied the identical methodology as Dr. Dennis, but, using Winfield's average annual profit number of $5,000.00 per year projected over Dalton's work life expectancy, calculated Dalton's total potential profits from the Cellular South agency as $112,500.00.

Certified Public Accountant Charles Rafferty, a business valuation expert offered by Cellular South, testified that the total value of the three Louisville Electronics entities was $132,000.00 as of February, 2004. He included Dalton's Cellular South agency when he

prepared his appraisal. Rafferty's evaluation is significant because Dalton actually sold Louisville Electronics, excluding the computer repair business and the Cellular South agency, for $135,000.00 at the end of calendar year 2004. By that time, Dalton had acquired an Alltel cellular telephone agency. Rafferty testified that this indicated that the value of the Alltel agency was approximately the same as the value of the Cellular South agency.

Although the court does not have to determine the amount of Dalton's damages, the court has serious reservations that Dalton's Radio Shack store and his computer sales and repair business were sustaining the steep losses that would result in the Cellular South agency realizing an average net profit of $93,465.00 per year. The court perceives Dalton to be a sensible and reasonable businessman who would not allow losses of this nature for these two entities to continue over a protracted period of time. Because the records of the three entities were co-mingled, the calculations provided to support the economic damages border on speculation. Consequently, Dalton's projected claim for lost profits over his work life expectancy according to the methodology employed by his experts is simply not realistic.

## VI.

For quite some time, the general rule in Mississippi was that damages for mental anguish were not recoverable from a breach of contract in the absence of a finding of an independent intentional tort separate from the breach of contract. *See Clardy v. APAC - Mississippi, Inc.*, 190 B.R. 552 (Bankr. N.D. Miss. 1995), aff'd 223 B.R. 507 (N.D. Miss. 1998). However, the Mississippi Supreme Court has moved away from that theory to its current rule that a plaintiff may recover for mental anguish in a contract action where the mental anguish was a foreseeable consequence of the breach, and the plaintiff actually suffered mental anguish.

15

A case which illustrates the Supreme Court's change is *Univ. of S. Miss. v. Williams*, 891 So. 2d 160 (Miss. 2004). In *Williams,* a doctoral candidate brought a lawsuit against the University of Southern Mississippi and three professors asserting that they had prevented her from receiving her doctoral degree and caused her severe emotional and mental anguish. Significantly, the plaintiff alleged that one of the professors had assaulted her in her residence. The Mississippi Supreme Court offered the following comments:

> This Court traditionally has held that emotional distress and mental anguish damages are not recoverable in a breach of contract case in the absence of a finding of a separate independent intentional tort. *Life & Cas. Ins. Co. v. Bristow*, 529 So. 2d 620, 624 (Miss. 1988). In recent years, however, this Court has moved away from this requirement. See *Southwest Miss. Reg'l Med. Ctr. v. Lawrence*, 684 So. 2d 1257, 1269 (Miss. 1996)
> 
> . . . .
> 
> We take this opportunity to clarify the burden for recovery of mental anguish and emotional distress in breach of contract actions. Plaintiffs may recover such damages without proof of a physical manifestation. *Adams v. U.S. Homecrafters, Inc.*, 744 So. 2d 736, 743 (Miss. 1999). Furthermore, expert testimony showing actual harm to prove mental injury is not always required. *Gamble v. Dollar Gen. Corp.*, 852 So. 2d 5, 11 (Miss. 2003). However, the plaintiff must show (1) that mental anguish was a foreseeable consequence of the particular breach of contract, and (2) that he or she actually suffered mental anguish. Such generalizations as "it made me feel bad," or "it upset me" are not sufficient. A plaintiff must show specific suffering during a specific time frame. These requirements are not different from the requirements to establish physical pain and suffering.
> 
> . . . .
> 
> Thus, "the nature of the incident" can be important in two ways. First, understanding the nature of the incident is essential in establishing whether emotional distress is foreseeable. Additionally, in cases where the defendant's conduct is more egregious, the plaintiff's burden of establishing specific proof of suffering will decrease. Nevertheless, the burden is there, and a plaintiff seeking emotional distress damages for a breach of contract must provide more than general declarations of emotional distress.
> 
> In the case before us, we have no doubt that Williams presented sufficient proof of emotional distress caused by USM's failure to fulfill its contractual

16

obligations. Furthermore, she was denied the fruits of her many years of academic labors.

>
> We must point out that Williams mentioned several times in her testimony the emotional effects Stamper's actions had on her. Specifically, Williams testified about the assault in her home and its effects on her mental and emotional well-being. Williams testified that later that evening, she actually considered suicide, and had her gun in her hands, but that her son was able to wrestle the gun away from her. In addition to the assault by Stamper, Williams testified to harassing phone calls and a shadowy figure outside her bedroom window in the late night/early morning hours.

*Id.* at 172 - 73. *See also, Morris Newspaper Corp. d/b/a WXXV-TV v. Allen*, 932 So. 2d 180 (Miss. 2005).

In the proceeding before this court, the Agreement executed between Cellular South and Dalton contains several provisions that address how the Agreement could be terminated. For the reasons discussed hereinabove, Cellular South made a business judgment determination that the agency program was not in the overall best interest of the organization. In order to provide better customer service, Cellular South decided that it would conduct its operations from its company owned stores. Once that decision was finalized, a notice as specified in the Agreement was disseminated to all of the individuals who had agency relationships with Cellular South. Dalton was not singled out. He just happened to be included within a program that was being discontinued because it was not functioning effectively. The President and Chief Executive Officer of Cellular South testified unequivocally that he thought that he had the right to terminate the agency program pursuant to the terms of the Agreement. He obviously had no intent to personally harm Dalton or any of the other agents. In the opinion of the court, even if the Agreement was breached, which it was not, the level of mental anguish and distress allegedly experienced by Dalton was not foreseeable.

17

As to whether Dalton actually suffered mental anguish, the opinions of two well qualified expert psychiatric witnesses, Dr. Mark Webb and Dr. John Montgomery, varied significantly - much like the expert witnesses' testimony on the issue of economic damages. The court would note that Dalton did not begin to see Dr. Webb until September, 2010, well over six years after the termination of the agency relationship by Cellular South. His sessions with Dr. Webb also followed a fairly serious automobile accident in which Dalton was involved. While Dalton still expresses symptoms of depression to Dr. Webb, the more serious symptoms such as his thoughts of suicide seem to have abated. The court, however, could not ignore Dalton's comment to Dr. Montgomery, who was employed by Cellular South to conduct an independent evaluation, that his symptoms of depression would vanish if he received a substantial amount of compensation from Cellular South. Dr. Montgomery opined that Dalton exhibited signs of malingering.

VII.

Dalton has also sought an award of punitive damages from Cellular South because of the termination of the Agreement. The Mississippi standard for an award of punitive damages was articulated in the case of *Sudeen v. Castleberry*, 794 So. 2d 237 (Miss. Ct. App. 2001), where the court held as follows:

> The law in Mississippi is settled that punitive damages are recoverable in an action for breach of contract. *Polk v. Sexton*, 613 So. 2d 841, 845 (Miss. 1993); *Fought v. Morris*, 543 So. 2d 167, 173 (Miss. 1989). The trial court relied on *Polk v. Sexton*, 613 So. 2d 841 (Miss. 1993), in rendering its judgment and opinion regarding the issue of punitive damages. *Polk* reaffirms that punitive damages are recoverable in breach of contract cases "where such breach is attended by intentional wrong, insult, abuse, or such gross negligence as amounts to an independent tort." *Id.* at 845. Punitive damages, however, are appropriate "only in extreme cases," and should be awarded only with "caution and within narrow limits." *Bryant v. Alpha Entertainment Corp.*, 508 So. 2d 1094, 1098

18

(Miss. 1987). The award of punitive damages and the amount, however, is within the discretion of the trier of fact. *Polk*, 613 So. 2d at 845.

Even if the Agreement was breached by Cellular South, under the circumstances of this proceeding, the conduct of Cellular South in exercising its business judgment in discontinuing the agency program in its entirety does not begin to rise to a level that would merit an award of punitive damages.

This the 30th day of July, 2012.

DAVID W. HOUSTON, III
UNITED STATES BANKRUPTCY JUDGE